JULIE A. GOLDBERG, ESQ., SBN 235565
Goldberg & Associates
5586 Broadway
Third Floor
Bronx, NY 10463
Tel: (718)432-1022
Fax: (718)432-1044
Email: USCIS@goldbergimmigration.com

Attorney for Plaintiffs

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SABA'A MOHAMMED AL-HADA,<br>MALAK FATH OBEID,<br>BARAAH FATH OBEID,<br>AYHAM FATH OBEID,<br><br>    Plaintiffs,<br><br>   v.<br><br>MICHAEL POMPEO, Secretary of State; JEFFERSON B.<br>SESSIONS, III, Attorney General; KIRSTJEN NIELSEN,<br>Secretary of the Department of Homeland Security; LEE<br>FRANCIS CISSNA, Director of United States Citizenship and<br>Immigration Services; U.S. DEPARTMENT OF STATE; U.S.<br>DEPARTMENT OF HOMELAND SECURITY; UNITED<br>STATES CITIZENSHIP AND IMMIGRATION SERVICES;<br>UNITED STATES DEPARTMENT OF JUSTICE;<br><br>    Defendants. | **EX PARTE<br>COMPLAINT FOR<br>DECLARATORY<br>AND INJUNCTIVE<br>RELIEF FOR<br>EMERGENCY WRIT<br>OF MANDAMUS** |

**COME NOW** Plaintiffs Saba'a Mohammed Al-Hada, Malak Fath Obeid, Baraah Fath Obeid, and Ayham Fath Obeid, in the above-styled and numbered cause, Ex-Parte Complaint for Declaratory and Injunctive Relief for Emergency Writ of Mandamus against Defendants allege as follows:

## <u>INTRODUCTION</u>

1. Presidential Proclamation 9645 of September 24, 2017 (the "Proclamation"), commonly referred to as the "Muslim Ban" and recently upheld by the United States Supreme Court, prohibits the entry of nationals from seven countries, including Yemen. This ban allegedly established a process for obtaining a waiver in individual cases.

2. Plaintiff Saba'a Mohammed Al-Hada ("Saba'a") is a Yemeni national who received the rare and precious opportunity to immigrate to the United States through the diversity visa program.

3. Saba'a's children, Malak Fath Obeid, Baraah Fath Obeid, and Ayham Fath Obeid (henceforth referred to as the "Children") are all U.S. citizens who are currently living with their mother in Djibouti.

4. By the terms of the diversity visa program, Saba'a must be issued her diversity visa by September 30, 2018, the end of the fiscal year, or she will lose her slot.

5. However, as a national of Yemen, Saba'a has been blocked by the Proclamation from receiving an immigrant visa.

6. The only way she can obtain her diversity immigrant visa is if she obtains a waiver under Section 3(c) of the Proclamation.

7. Statutes, regulations, the Proclamation, and agency guidance interpreting the Proclamation make clear that Defendants ("Defendants") have a *mandatory duty to issue a reasonably prompt decision on visa applications and applications for waivers under the Proclamation*.

8. Unfortunately, Saba'a is relying on a sham waiver pursuant to the Proclamation. The waiver adjudication process is fraudulent.

9.   Defendants have repeatedly falsely represented that the Proclamation contains a meaningful waiver process. In its public filings, the government has described the waiver process as "robust," "comprehensive" and "individualized." (*See* Exhibits Y at p.12; Z at pgs. 4, 13, 28; AA at p. 25 n.8). It has also characterized the process as entirely within the consular officer's discretion. (Exhibit W at p. 76).

10.   However, publicly available evidence, as well as information undersigned counsel has obtained from directly affected individuals, suggest that the process is cursory, nonexistent, not left to consular discretion, or so limiting that it can be considered nonexistent. (*See* Exhibits T; X).

11.   Former U.S. Department of State officer, Christopher Richardson, Esq., has declared under penalty of perjury that the cables relating to the waiver, "when read together with our training, it is understood that there *really is no waiver*." (Exhibit T). Moreover, Mr. Richardson continued by stating that the waiver is merely "window dressing". *Id*.

12.   The lack of transparency and conflicting reports have led other public officials to seek information about how waivers are assessed, granted or denied, and whether the waiver process is merely "window dressing." (*See* Exhibits V; X).

13.   Another recently published report further documents the opacity of the process, the conflicting reports, the absence of guidelines, and the resulting challenges faced by those seeking to avail themselves of the waiver process. (*See* Exhibit BB).

14.   Furthermore, two Supreme Court justices have noted that the transparency and effectiveness of the waiver scheme would be crucial in assessing the Proclamation's lawfulness. *Trump v. Hawaii*, 585 U.S. (2018) (Breyer, J. dissenting).

15.   Moreover, there is a long history of the Justice Department omitting and misrepresenting facts to the courts in support of government policies.

16.   Saba'a's Children, as U.S. citizens have a constitutional protected right to familial association and to be raised by their mother in the United States.

17.   Saba'a has fulfilled all of the requirements to obtain a diversity visa. Moreover, she has properly applied for the waiver.

18.   However, Defendants have unreasonably and unlawfully delayed in making a final decision on Saba'a's ability to immigrate to the United States; leaving her and her United States citizen children in a state of administrative uncertainty.

19.   With the September 30, 2018 deadline looming, Saba'a faces imminent, irreparable harm: the dire prospect of losing her chance to immigrate to the United States with the Children and escape the grasp of her ex-husband who has raped, beaten, and sexually assaulted her. Her ex-husband has also kidnapped one of her children and taken the child to the United States. Since returning the child, he has consistently threatened to kidnap the Children.

20.   It is no longer safe for Saba'a and her Children (henceforth referred to as the "Al-Hada Family") to reside in Yemen, as her ex-husband has a lot of influence in the community, and can take the Children away  immediately upon her return to Yemen. Djibouti is very expensive, and she cannot afford to live there much longer.

21.   Defendants' delay in issuing final decisions in this case – given the imminent September 30, 2018 deadline – is unreasonable, without justification, and is further proof that the Proclamation's waiver process a sham.

22.   Plaintiffs seek narrow but potentially life-changing relief: an order directing Defendants to fulfill their mandatory duties to render a prompt adjudication of Plaintiff Saba'a's visa and

waiver applications. Moreover, Plaintiffs seek an order finding that the waiver process pursuant to the Proclamation is a sham.

## JURISDICTION AND VENUE

23.   This Court has subject matter jurisdiction over this Action under 28 U.S.C. § 1331, as questions of federal and constitutional law are present. This Court has subject matter jurisdiction over this Action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq. In addition, this Court has subject matter jurisdiction over this Action under the relevant provisions of the Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201. The action and/or actions being challenged are not excluded from the types of decisions that may be reviewed through a petition for review under INA § 242(a)(2)(B), 8 U.S.C. § 1252(a)(2)(B).

24.   This Court also has jurisdiction to issue a writ of mandamus to compel agency action under 28 U.S.C. § 1361, as Plaintiffs' claims are against United States agencies and officers and employees thereof.

25.   Plaintiffs have exhausted their administrative remedies, and no further administrative remedies exist to redress Plaintiffs' grievances described in this Complaint. This action challenges Defendants' procedural policies, practices, interpretations of law and their actions or failures to act, not discretionary acts shielded from judicial review under, for instance, Immigration and Nationality Act ("INA") § 242(a)(2)(B), 8 U.S.C. § 1252(a)(2)(B).  Accordingly, the jurisdictional limitations under 5 U.S.C. § 701(a)(2) and 8 U.S.C. § 1252 do not apply.  See Medina-Morales v. Ashcroft, 371 F.3d 520, 528 (9th Cir 2004); see also Ruiz v. Mukasey, 552 F.3d 269, 273–76 (2d Cir. 2009); Ayanbadejo v. Chertoff, 517 F.3d 273, 276–78 (5th Cir. 2008) ("Determinations regarding the validity of

marriage for I-130 petition purposes are not discretionary within the meaning of § 1252(a)(2)(B), and thus are subject to review by courts.").

26.    Venue is proper in the Central District of California under 28 U.S.C. § 1391(e)(1), as (i) this is an Action in which Defendants are officers or employees of the United States and/or an agency or agencies thereof acting in their official capacity under color of legal authority, or one or more agencies of the United States; (ii) a substantial part of the events or omissions giving rise to the claims occurred in this judicial district; and (iii) no real property is involved in this Action.  See 28 U.S.C. § 1391(e)(1).

## PARTIES

**Plaintiffs:**

27.    Plaintiff Saba'a Mohammed Al-Hada is a national of Yemen. She is a principal applicant in an application for an immigrant visa through the United States diversity immigrant visa program. She was selected as a diversity lottery winner on May 2, 2017. Her visa application awaits a final decision from Defendant U.S. Department of State. She has submitted an application for a waiver under Section 3(c) of the Proclamation, which awaits a final decision from Defendant U.S. Department of State. If issued a visa, she plans to reside in Sherman Oaks, California, where she has a sponsor, as well as a pro bono attorney to help her file for sole custody of her children. She files this petition and complaint on her own behalf.

28.    Plaintiff Malak Fath Obeid is a United States citizen who currently resides in Djibouti with her siblings and mother. Malak's father is extremely abusive toward Plaintiff Saba'a and the other children. If Saba'a is issued a visa, Malak is going to attend school in Sherman

Oaks, California, and will have the protection of the Los Angeles courts regarding her custody determination.

29.     Plaintiff Baraah Fath Obeid is a United States citizen who currently resides in Djbouti with her siblings and mother. Baraah's father is extremely abusive toward Plaintiff Saba'a and the other children If Saba'a is issued a visa, Baraah is going to attend school in Sherman Oaks, California, and will have the protection of the Los Angeles courts regarding her custody determination.

30.     Plaintiff Ayham Fath Obeid is a United States citizen who currently resides in Djbouti with his siblings and mother. Ayham's father is extremely abusive toward Plaintiff Saba'a and the other children. If Saba'a is issued a visa, Ayham is going to attend school in Sherman Oaks, California, and will have the protection of the Los Angeles courts regarding his custody determination.

31.     **Defendants:**

32.     Defendant Michael Pompeo is the Secretary of State. Defendant Pompeo is responsible for implementing and administering the Proclamation, including the waiver process created by Section 3(c) of the Proclamation. Further, Defendant Pompeo is responsible for administering the U.S. diversity immigrant visa program. He is sued in his official capacity.

33.     Defendant Jefferson B. Sessions, III is the Attorney General of the United States and, in that capacity, is the head of the DOJ, which is concerned with legal affairs of the United States of America. More specifically, the Attorney General, as the head of the DOJ, oversees the administration of the BIA, an administrative appellate body within the Executive Office for Immigration Review (which itself falls within the purview of the authority of the DOJ). This action is brought against him in his official capacity.

34. Defendant Kirstjen Nielsen is the Secretary of the DHS, and this action is brought against her in her official capacity.  DHS is the agency responsible for implementing the Immigration and Nationality Act ("INA"). Defendant Nielsen is generally charged with the enforcement of the INA and is responsible for implementing the provisions of the INA.  Defendant Nielsen is further authorized to delegate such powers and authority to subordinate DHS employees. See 8 U.S.C. § 1103(a); 8 C.F.R. § 2.1.  She is being sued in his official capacity.

35. Defendant Lee Francis Cissna is the Director of United States Citizenship and Immigration Services ("USCIS"), an agency within the Department of Homeland Security ("DHS") to which the Secretary's authority has in part been delegated and is subject to the Secretary's supervision. Defendant Director Cissna is charged with the administration of immigration benefits and immigration services. 8 C.F.R. §100.2(a). This action is brought against him in his official capacity.

36. Defendant U.S. Department of State ("State Department") is a federal cabinet agency responsible for implementing and administering the Proclamation, including the waiver process created by Section 3(c) of the Proclamation, and the U.S. diversity immigrant visa program, including but not limited to holding visa interviews; conducting administrative processing of applications for diversity immigrant visas; making final decisions on the issuance of diversity immigrant visas; issuing diversity immigrant visas; and receiving, adjudicating, and making final decisions regarding applications for waivers under Section 3(c) of the Proclamation. The Department of State is a Department of the Executive Branch of the United States Government, and is an agency within the meaning of 5 U.S.C. § 552(f).

37.    Defendant Department of Homeland Security ("DHS") is the overarching federal agency of the Executive Branch of the United States Government that has been delegated the authority over, inter alia, (1) visa petitions and applications to adjust status, including coordinating the timely completion of background checks with the FBI; (2) immigration generally; (3) customs; and (4) border security.

38.    Defendant United States Citizenship and Immigration Services ("USCIS") is a bureau within DHS, and is the agency charged with direct and immediate responsibility of proper and timely adjudication of visa petitions—specifically, I-130 Petitions—and applications to adjust status.

39.    Defendant U.S. Department of Justice ("DOJ") is the agency of the United States that is concerned with legal affairs of the country, including the administration of the Board of Immigration Appeals ("BIA"), an administrative appellate body within the Executive Office for Immigration Review (which itself falls within the purview of the authority of the DOJ).

## BACKGROUND AND STATEMENT OF FACTS

40.    Defendants have a mandatory duty to issue reasonably prompt decisions on visa applications and requests for waivers under the Proclamation.

### Statutory and Regulatory Framework for Diversity Immigrant Visa Adjudication

41.    The Immigration and Nationality Act authorizes consular officers to issue immigrant visas and nonimmigrant visas to foreign nationals who are eligible for those visas and admissible to the United States. See 8 U.S.C. § 1201; 22 C.F.R. § 42.71.

42.   One type of immigrant visa created by Congress is the diversity immigrant visa. See 8 U.S.C. § 1153(c). The diversity immigrant visa program is intended to provide immigration opportunities for people who live in countries with historically low rates of immigration to the United States.

43.   To be eligible for a diversity visa, an applicant must be a national of a country covered by the program, must have either a high school education or two years of qualifying work experience, see 8 U.S.C. § 1153(c)(2), and must not be inadmissible under 8 U.S.C. § 1182(a). Spouses and unmarried minor children of the applicant are entitled to the same status as the applicant. See 8 U.S.C. § 1153(d).

44.   Each fiscal year, the State Department conducts a lottery to award no more than 50,000 diversity visas from among the many millions of lottery entries it receives. The State Department then processes the winners' applications for immigrant visas. The process requires the winners to submit certain documents and attend a consular interview.

45.   **If a lottery winner satisfies the eligibility criteria and is not inadmissible under 8 U.S.C. § 1182(a), and if visas remain available, then consular officials *must* issue an immigrant visa.** See 8 U.S.C. § 1153(c)(1) (making the issuance of diversity visas mandatory for eligible qualified immigrants); 22 C.F.R § 40.6 (visas may only be refused on "a ground specifically set out in the law or implementing regulations").

46.   While consular officials have discretion to deny or grant a visa, State Department regulations create an unequivocal mandatory duty to issue a decision on the visa application. **22 C.F.R. 42.81(a) states "When a visa application has been properly completed and executed . . . the consular officer *must* either issue or refuse a visa under INA 212(a) or INA 221(g) or other applicable law."** (Emphasis added.) If a visa

is refused, and the applicant provides evidence tending to overcome the ground of ineligibility on which the refusal was made, "the case shall be reconsidered." 22 C.F.R. § 42.81(e).

47.    **Further, any decision by a consular officer on a visa application must be issued "within a reasonable time." 5 U.S.C. § 555(b).**

48.    If a lottery winner does not receive his or her visa by the end of the fiscal year (September 30), the winner loses his or her slot and must re-enter the lottery. See 8 U.S.C. § 1154(a)(l)(I)(ii)(II).

49.    Further, because the State Department selects far more applicants to proceed in the diversity visa lottery than the annual allotment of 50,000 diversity visas, the number of remaining visas dwindles as the September 30 fiscal year end draws closer. Once the 50,000 visas have been issued, the program for Fiscal Year 2018 will end. Therefore, a diversity visa lottery winner may be foreclosed from receiving a diversity visa if the State Department issues all the diversity visas for that fiscal year.

50.    For the Fiscal Year 2018 diversity visa program, the State Department received approximately 14.6 million qualified entries, and selected at random over 115,000 winners to proceed in the application process. Only a certain percentage of the 50,000 diversity visas for Fiscal Year 2018 have been allocated for nationals of the Asia region countries, which includes Yemen.

**The Presidential Proclamation, Visas and Waivers for Nationals of Yemen**

51.    The Proclamation has imposed restrictions on the issuance of visas and entry of Yemeni nationals to the United States, with limited exceptions.

52. Alongside the suspension of visa issuance to Yemeni nationals, the Proclamation allegedly creates a waiver that could be granted by consular officers to allow Yemeni nationals to receive visas and travel to the United States if they fulfilled certain criteria.

53. The Proclamation and agency guidance interpreting the Proclamation make clear that Defendants have a mandatory duty to act on applications for waivers.

54. Proclamation 9645, entitled "Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats" was issued on September 24, 2017. See 82 Fed. Reg. 45161 (Sept. 27, 2017). On April 10, 2018, the President issued a proclamation lifting the entry restrictions on nationals of Chad, but leaving in place all other entry restrictions and provisions of the Proclamation of September 24, 2017. See 83 Fed. Reg. 15937 (Apr. 13, 2018).

55. Section 2(g) of the Proclamation indefinitely suspends the entry of nationals of Yemen into the United States as immigrants and as nonimmigrants on business (B-1), tourist (B-2), and business/tourist (B-1/B-2) visas. Proclamation § 2(g).

56. The indefinite suspension is allegedly subject to the adjudication of case-by-case waivers described in Section 3 of the Proclamation.

57. Section 3(c) of the Proclamation allegedly establishes the waiver process by which nationals of Yemen can obtain a visa to enter the United States. Under this subsection, a consular officer is authorized to grant a discretionary waiver, on a case-by-case basis, to an individual whose entry is restricted under the Proclamation if that individual demonstrates that the waiver "would be appropriate and consistent" with certain criteria listed in the Proclamation.

58.   Specifically, the individual must demonstrate to the consular officer's satisfaction that: "(A) denying entry would cause the foreign national undue hardship; (B) entry would not pose a threat to the national security or public safety of the United States; and (C) entry would be in the national interest." Proclamation § 3(c)(i).

59.   The Proclamation specifies that a case-by-case waiver may be appropriate in "individual circumstances" such as where a "foreign national seeks to enter the United States to visit or reside with a close family member (e.g., a spouse, child, or parent) who is a United States citizen, lawful permanent resident, or alien lawfully admitted on a valid nonimmigrant visa, and the denial of entry would cause the foreign national undue hardship." Proclamation § 3(c)(iv).

60.   The Proclamation was challenged in court. On December 4, 2017, the Supreme Court granted Defendants' application for a stay of the preliminary injunction entered by the District Court for the District of Hawaiʻi. *See Trump v. Hawaiʻi, No. 17A550, --- S. Ct. --- -, 2017 WL 5987406 (Mem) (Dec. 4, 2017)*. The Proclamation's suspensions on the issuance of visas to Yemeni nationals, and the waiver process established in Section 3(c) of the Proclamation, became effective immediately.

61.   Current State Department guidance setting forth its implementation of the Proclamation confirms that consular officers must issue waivers to nationals of the countries listed in the Proclamation when they determine that the visa applicant meets the three criteria specified in Section 3(c): "issuance [of the visa] is in the national interest, the applicant poses no national security or public safety threat to the United States, and denial of the visa would cause undue hardship." (*See* Exhibit U). The State Department explains that an individual

13

who seeks a waiver "should apply for a visa and disclose during the visa interview any information that might demonstrate that he or she is eligible for a waiver." *Id.*

62.   In a February 22, 2018 letter (the "February 22 Letter"), the State Department describes the process by which a consular officer assesses and determines whether to grant a waiver to an applicant for an immigrant visa that is subject to the Proclamation. (Exhibit V).

63.   First, visa applicants subject to the Proclamation undergo the same visa application process as visa applicants that are not subject to the Proclamation, including the submission of a visa application form, background and security screening, and a consular interview, which "results in a decision by a consular officer." *Id.* at 1-2 (citing 8 U.S.C. §§ 1201(a)(1), 1202(b), 1202(h), 1204; 22 C.F.R. §§ 41.102, 42.62).

64.   Second, if the applicant is eligible for a visa, the consular officer must determine whether the applicant falls within an exception to the Proclamation. *Id.*

65.   Third, if an applicant does not fall into an exception, the consular officer must consider the applicant for a waiver under the Proclamation. *Id.*

66.   The Department of State states unequivocally: "Each applicant who meets the conditions set forth in section 3(c) of the Proclamation *must be considered for a waiver*." *Id.* (emphasis added).

67.   Furthermore, the February 22 Letter outlines how the waiver criteria are evaluated:

1) to satisfy the undue hardship criterion, the applicant must demonstrate to the consular officer's satisfaction that an unusual situation exists that compels immediate travel by the applicant and that delaying visa issuance and the associated travel plans would defeat the purpose of travel;

14

2) the applicant's travel may be considered in the national interest if the applicant demonstrates to the consular officer's satisfaction that a U.S. person or entity would suffer hardship if the applicant could not travel until after visa restrictions imposed with respect to nationals of that country are lifted; and

3) to establish that the applicant does not constitute a threat to national security or public safety, the consular officer considers the information-sharing and identity-management protocols and practices of the government of the applicant's country of nationality as they relate to the applicant. *Id.*

68.     The February 22 Letter states that a consular officer may determine, in consultation with the Department of State's Visa Office, that an applicant does not pose a threat to national security or public safety. *Id.* If the consular officer then also determines that the other two criteria for a waiver have been met, the consular officer may issue a visa "with the concurrence of a consular manager." *Id.*

69.     The Proclamation's restrictions on the issuance of immigrant visas to Yemeni nationals, as well as the waiver provision of Section 3(c) are presently in effect.

**The Presidential Proclamation Waiver Adjudication is a Sham**

70.     Defendants have repeatedly falsely represented that the Proclamation contains a meaningful waiver process. In its public filings, the government has described the waiver process as "robust," "comprehensive" and "individualized." (*See* Exhibits Y at p.12; Z at pgs. 4, 13, 28; AA at p. 25 n.8). It has also characterized the process as entirely within the consular officer's discretion. (Exhibit W at pg. 67).

71.     However, publicly available evidence, as well as information undersigned counsel has obtained from directly affected individuals, suggest that the process is cursory, nonexistent,

not left to consular discretion, or so limiting that it can be considered nonexistent. (*See* Exhibits T; X).

72.     The Proclamation further requires the Secretary of State and the Secretary of Homeland Security to coordinate to adopt guidance establishing when waivers may be appropriate for otherwise barred foreign nationals. No such guidance has been publicly promulgated to date, and the agencies have not provided any meaningful information about the waiver application procedure, how waiver eligibility determinations are made, and whether any recourse exists for persons denied a waiver.

73.     However, publicly available statements by consular officers have confirmed that some guidance has been promulgated, at least in the form of guidance cables, sample questions and answers, and other instructions. (*See* Exhibits T; X).

74.     Such documents, essential to understanding the Proclamation as it is written" and "as it is applied", are reportedly not classified. *Trump v. Hawaii*, 585 U.S. ____, ____ (2018) (Breyer, J. dissenting) (internal quotes omitted).

75.     Despite the text of the Proclamation and Defendants' statements that consular officers must consider all visa applicants subject to the Proclamation for waivers, recent statements from consular officers who adjudicate such waivers provides evidence that Defendants delay or avoid fulfilling the officer's non-discretionary duty to make decisions on visa and waiver applications. (Exhibit X).

76.     Former U.S. Department of State officer, Christopher Richardson, Esq., has submitted a sworn declaration under penalty of perjury disclosing that, although consular officials are statutorily vested with discretion to adjudicate visa applications, see 8 U.S.C. §§ 1101(a)(9), (16), and "regardless of the [Proclamation's] instructions that we had

'discretion to grant the waiver,' we were not allowed to exercise that discretion. We were mandated to send to Washington that we found this applicant eligible to apply and Washington would then make the decision to grant or deny the waiver." (*See* Exhibit T). He further explained, "when read together with our training, it is understood that there *really is no waiver*." (Exhibit T). Moreover, Mr. Richardson continued by stating that the waiver is merely "window dressing". *Id.*

77.   On April 25, 2018, the Supreme Court held oral argument in *Trump v. Hawaii*, Case No. 17-965. During oral argument, the Solicitor General, appearing on behalf of Defendant State Department, confirmed that "State Department consular officers automatically apply the waiver process in the course of every visa application," and that the waiver provision "does get applied in every single case." (*See* Exhibit W).

78.   On June 26, 2018, the Supreme Court held that the plaintiffs challenging the Proclamation in *Trump v. Hawaii* were unlikely to succeed on the merits of their claims and reversed the grant of the preliminary injunction enjoining the Proclamation. *See Trump v. Hawaii*, Case No. 17-965, --- U.S. ---, Slip Op. at 38 (U.S. June 26, 2018).

79.   In upholding the Proclamation, the Court observed, "[T]he Proclamation creates a waiver program open to all covered foreign nationals seeking entry as immigrants or nonimmigrants." *Id.* at 37.

80.   However, government statistics indicate that the number of waivers granted is "a miniscule percentage" of those eligible for visas—during the Proclamation's first month, the State Department reported that of the 6,555 applicants it received, it approved only two for waivers. *Hawaii*, 585 U.S. at _____ (2018) (Breyer, J. dissenting) (internal quotes omitted).

81.     In light of the Supreme Court's ruling upholding the Proclamation's indefinite ban, a waiver grant is the exclusive means by which banned nationals of the named countries may enter the United States. Unfortunately for these individuals, the U.S. waiver adjudication process is mere "window dressing".

**The Justice Department Has Historically Provided Erroneous Information to Support Government Policies**

82.     There is a long history of the Justice Department omitting and misrepresenting facts to the courts in support of government policies.

83.     In *Korematsu v. United States*, 323 U.S. 214 (1944) *overruled by Trump v. Hawaii*, No. 17-965, 585 U.S. ___ (2018) the Supreme Court upheld the obviously discriminatory and racist Executive Order 9066 on the basis of government representations of military necessity.

84.     A 1982 report by the Commission on Wartime Relocation and Internment of Civilians found that the Justice Department relied upon military reports to justify the Executive Order in its brief to the Supreme Court, despite substantial FCC and Justice Department findings that these claims had no factual backing. Personal Justice Denied at 86-87 (Washington, D.C., 1982).

85.     A court ultimately found that the "record is replete with protestations of various Justice Department officials that the government had the obligation to advise the courts of the contrary facts and opinions", protestations that the Solicitor General ignored to supply a convenient legal rationale for Executive Order 9066. *Korematsu v. United States*, 584 F.Supp. 1406, 1418 (N.D. Cal. 1984).

86.     Korematsu was ultimately granted a writ of *coram nobis* based on findings that "government officials had known at the time of the internment decision that there had been

no military necessity and that government officials had intentionally deceived the Supreme Court about this state of affairs." Brief for Petitioners as Amicus Curiae at 15, *Al Odah v. United States*, No. 03-343.

87.   Such deceptions were not immaterial to the Courts' decision. Indeed, a district court later found, after extensive fact-finding, that "the reasoning of the Supreme Court would probably have been profoundly and materially affected if the Justice Department had advised it of the suppression of evidence which established the truthfulness of the allegations made by … Korematsu concerning the real reason for the exclusion order" *Hirabayashi v. United States*, 828 F.2d 591, at 603-604 (9th Cir. 1987).

88.   The Justice Department continues to supply erroneous facts that are used to support contentious government policies to the present day. In *Demore v. Kim*, 538 U.S. 510 (2003) a closely divided Supreme Court issued a 5-4 ruling that held that legal permanent residents are not entitled to bail when detained and appealing deportation rulings. The majority's ruling in *Demore* was largely based on incorrect statistics provided by the Justice Department, showing most such detentions to be relatively short.

89.   In a letter to the Supreme Court in 2016 the Solicitor General admitted these statistics were inaccurate, with the detention times for some types of cases taking an average of 382 days to resolve, far longer than the 113 days in the statistics presented to the Supreme Court. Letter from Ian Gershengorn, Acting Solicitor Gen., U.S. Dep't of Justice, to Scott Harris, Clerk, Supreme Court of the U.S. (August 26, 2016).

90.   Similarly, in *Nken v. Holder*, 556 U.S. 418 (2009) the Supreme Court found that immigrants facing deportation could never show the irreparable injury necessary to avoid removal based solely on a pending court action challenging that deportation. This finding

was based on a brief from the Solicitor General assuring the Court that the government had a "policy and practice" of returning deportees who later won their cases to their pre-deportation status. Brief for Respondent at 44, *Nken v. Holder*, 556 U.S. 418, 435, No. 08-681 (2009).

91.    In 2012, the Solicitor General's Office was again forced to send a letter to "clarify and correct" its previous brief in the *Nken* case, essentially admitting that the policy and practices described in the brief had never, in fact, existed. Letter from Michael R. Dreeben, Deputy Solicitor Gen., U.S. Dep't of Justice, to William K. Suter, Clerk, Supreme Court of the U.S. (April 24, 2012).

92.    The 2012 letter, correcting the brief in *Nken*, was only sent because the Justice Department was faced with a court order to turn over internal Justice Department emails detailing the policy described in the Solicitor General's brief. *Nat'l Immigration Project of the Nat'l Lawyers Guild v. U.S. Dep't of Homeland Sec.*, 842 F. Supp. 2d 720, 730 (S.D.N.Y. 2012) (granting summary judgment for plaintiffs on release of the email communications that were the basis of the Solicitor General's statements). Nevertheless, the holding of *Nken*, based on misrepresentations of the Solicitor General, remains on the books and lower courts have revised the caselaw of stays on that basis. *See Mhanna v. U.S. Dep't of Homeland Sec. Citizenship & Immigration Servs.,* No. CIV. 10-292, 2010 WL 584034 (D. Minn. 2010).

93.    In *Clapper v. Amnesty Intern. USA*, 586 U.S. 398 (2013), the Supreme Court, by a 5-4 vote, dismissed a challenge to NSA wiretapping. The majority based this dismissal on a claim made by the government that the Justice Department would notify any defendants whose information had been "obtained or derived" from the NSA wiretapping. Gov't Brief at 8,

*Clapper v. Amnesty Intern. USA*, 586 U.S. 398 (2013). These Justice Department assurances proved false; within a year it emerged that such notices were not actually being provided. Eric Schmitt, David E. Sanger, Charlie Savage, *Administration Says Mining of Data is Crucial to Fight Terror*, N.Y. Times, (June 7, 2013)

94.     In response to questions from United States Senators as to why the Justice Department was not providing notification to defendants as it stated it would in its Brief in *Clapper,* the Justice Department responded with a letter essentially stating the definition of "obtained or derived" [by NSA wiretapping] was not determined by the Court in *Clapper* so the Justice Department was free to apply its own definition. Letter from Peter J. Kadzik, Principal Deputy Assistant Attorney Gen., U.S. Dep't of Justice, to Mark Udall, United States Senator (December 24, 2013).

95.     As a result of such longstanding and ongoing Justice Department abuses there is serious debate as to whether the Supreme Court should continue to "treat statements of fact from the OSG [Office of the Solicitor General] as presumptively trust-worthy." Nancy Morawetz, *Convenient Facts: Nken v. Holder, The Solicitor General, and the presentation of Internal Government Facts*, 88 N.Y. L. Rev. 1600, 1605 (2013).

**Plaintiff Saba'a Mohammed Al-Hada Won the Diversity Visa Lottery and Applied for a Visa**

96.     Plaintiff Saba'a won the diversity visa lottery in May 2017 and subsequently followed all State Department instructions for completing her application.

97.     She must receive a waiver and be issued a visa no later than September 30, 2018, or she will lose her ability to receive a diversity immigrant visa.

98.     In addition, as the September 30, 2018 deadline approaches, Saba'a watches her chances to receive diversity visa dwindle. She runs the risk that the small portion of the diversity

visas allocated for Fiscal Year 2018 to the Asia region, which encompasses Yemen, will be issued to other diversity visa lottery winners.

99.  Saba'a is currently residing in Djibouti in order to escape the grasp of her ex-husband's physical, sexual, and mental abuse. (*See* Exhibit I).

100. Saba'a's three children, Malak, Baraah, and Ayham are all U.S. citizens. (*See* Exhibits C-H).

101. Saba'a submitted an application in November 2016 for the diversity immigrant visa program administered by Defendants. (Exhibit L).

102. On May 2, 2017, Saba'a learned that she won the lottery and was selected to proceed in the diversity immigrant visa program for Fiscal Year 2018. (Exhibit P).

103. Saba'a and her United States children were overjoyed in learning that they had the chance to move past their traumatic past and permanently live together safely in the United States.

104. Saba'a further submitted a Form DS-260 electronic application for immigrant visa for herself. (Exhibit M).

105. On July 17, 2018, Saba'a learned that she was scheduled to attend an interview to process her immigrant visa. (Exhibit Q).

106. On July 22, 2018, Saba'a attended an in-person visa interview at the U.S. consulate in Djibouti, Djibouti. At the interview, Saba'a paid the non-refundable application fees.

107. At the interview, Saba'a received a notice that her diversity immigrant visa application was found to be ineligible under Section 212(f) of the INA, pursuant to the Proclamation. (Exhibit R).

108. However, the notice stated, "the consular officer is reviewing your eligibility for a waiver under the Proclamation". *Id.*

109. The notice stated that the visa application will remain refused under Section 212(f) until the consular officer can make an individualized determination on the waiver. *Id.*

110. Saba'a has also submitted proof that she has completed high school and conducted the requisite medical examinations to be issued a diversity visa. (Exhibits P, Q).

111. On August 14, 2018, the Embassy in Djibouti responded to Plaintiffs' request to expedite the visa issuance due to Plaintiffs' particular circumstances. (Exhibit S). The Embassy responded by stating that "the embassy recommended a waiver in this case" but the case "is still undergoing administrative processing." *Id.*

112. To date, Defendants have yet to make any determination regarding Saba'a's eligibility for the waiver under the Proclamation.

**Saba'a Qualifies for the Waiver Pursuant to Section 3(c) of the Proclamation**

113. Saba'a applied for the waiver pursuant to the proclamation with sufficient evidence for Defendants to make a timely decision on her waiver and visa applications.

114. Her waiver application demonstrates that she satisfies the criteria to be issued a waiver under Section 3(c) of the Proclamation.

115. Her individual circumstances match those specified in Section 3(c)(iv)(D) of the Proclamation as ones where the grant of a waiver would be appropriate, i.e., she seeks to enter the United States in order to escape the physical, sexual, and mental abuse of her ex-husband and to reside safely with her U.S. citizen children.

116. Both Saba'a as the immigrant applicant and her U.S. citizen Children would suffer undue hardship if Saba'a does not receive the diversity immigrant visa.

117. Saba'a was sexually, physically, and psychologically abused by her ex-husband, Fateh Abdo Ali Obeid. (*See* Exhibit I).

118. At the inception of their marriage, everything was okay. As the marriage continued, however, her ex-husband began to change into an angry and abusive person. *Id.*

119. Saba'a's ex-husband began controlling her. He would order her around, would take away her phone, and would not allow her to speak with or go out with any of her friends or family. *Id*. He would threaten to divorce her or lock her in the house if she did not obey him. *Id.*

120. After the second year of marriage, Saba'a's ex-husband started to become a lot more aggressive. As Saba'a states, "there is no form of physical abuse he wouldn't do…it is indescribable how much he would hurt me. He would punch me in my face, my body, would kick me, pull my hair…" *Id.*

121. Saba'a's ex-husband would degrade her mentally. He would make her feel worthless.

122. The father of the Children would rape Saba'a repeatedly over the course of a decade. *Id.* He would arrive home intoxicated, hit her, yell at her, and force her to have unwanted and unconsented sex. *Id*.

123. Saba'a states that she cannot count how many times he would abuse and rape her because it happened so many times. He would physically and sexually assault her every three to four days. *Id*.

124. Saba'a constantly endured this abuse because of her U.S. citizen children. She wanted them to grow up in a normal two-parent household. *Id*.

125. However, the Children's lives soon became in danger as well. Their father would hit them when they attempted to protect their mother. He would punch, push away, and kick the Children. *Id.*

126. What's worse, the Children's father kidnapped Malak when he was five years old and took him to America. Malak was five years old when he was kidnapped and taken away from his mother. She was separated from her mother for two whole years. Saba'a felt trapped in the relationship at the time because she wanted to see Malak again and she was scared that if she asked for a divorce, her ex-husband would keep Malak away from her forever. *Id.* After two years, Malak was returned to her mother and younger sister in Yemen. *Id.*

127. At first when he came back, Saba'a's ex-husband seemed like a changed man. He was not abuse and seemed to have turned the corner. However, after the birth of their third child, Ayham, he began to rape and assault Saba'a again. *Id.*

128. The Childern's father repeatedly threatened to kidnap the children again and take them to the United States, away from their mother and only non-abusive parent.

129. As soon as the Children's father got a U.S. passport for Ayham, he divorced Saba'a. He was planned to kidnap the children and separate them from their mother and move them to the United States. He has been very aggressive and has repeatedly tried to take the Children away from their mother.

130. As a result, Saba'a moved to Djibouti with her Children in order to escape the abuse and grasp of her ex-husband. *Id.*

131. Saba'a and the Children are currently residing in Djibouti in constant fear of being found by her ex-husband.

132. Failure to grant the waiver would cause undue hardship to both Saba'a and her children, as they will be forced to return to Yemen where her ex-husband can find them, seriously harm them, and kidnap the Children.

133.   The fear of the Children being kidnapped and assaulted by their father and Saba'a being raped and battered by her ex-husband constitutes as "an unusual situation" that compels "immediate travel", cited as criteria in the February 22 Letter for receipt of waivers. Moreover, the looming September 30, 2018 deadline for issuance of the diversity visa is also and unusual situation that compels immediate travel. If the issuance of the waiver and the visa are delayed, the entire purpose of Saba'a's travel—to immigrate to the United States in order to safely reside with her United States citizen children here—would be defeated because September 30 extinguishes their ability to immigrate.

134.   Saba'a's entry into the United States is in the national interest as she seeks to immigrate into the U.S. to escape the abuse of her ex-husband and to allow her U.S. citizen children to live safely. If Saba'a does not receive a waiver and the family is forced to move back to Yemen, the Children would suffer hardship because they have a high risk of being found by their father, who will abuse and kidnap them. Saba'a is the parent that provides care and support to the Children. Moreover, Saba'a's ex-husband does not pay child support. If Saba'a immigrates to the United States, she can legally make sure that the Children receive the proper financial support.

135.   Saba'a poses absolutely no threat to the national security or public safety of the United States. She has never been arrested or committed any crimes. She is a law-abiding person. She has submitted extensive information about herself to the U.S. Embassy for administrative processing purposes.

**The State Department Has Unreasonably Withheld a Decision on Plaintiff's Waiver and Diversity Visa Applications**

136.   Saba'a completed her visa application over sixteen weeks ago, on May 21, 2018. (Exhibit L). About seven weeks ago, on July 22, 2018, Plaintiff Saba'a was informed that a consular officer will be reviewing her eligibility for a waiver under the Proclamation. (Exhibit Q).

137.   Plaintiffs, through their attorney, have contacted the U.S. consulate in Djibouti inquiring as to the status of Saba'a's waiver application. Plaintiffs have noted in their communications with the consulate that the September 30, 2018 deadline for issuance of diversity immigrant visas necessitates a prompt decision on their waiver and visa applications. (Exhibit S).

138.   In response to her attorney's inquiries, the U.S. Embassy informed Saba'a that "the embassy recommended a waiver in this case, but it too, is still undergoing administrative processing." (Exhibit S).

139.   To date, the Saba'a has received no email or other communication from the U.S. Embassy or Defendants with a final decision on her waiver or visa applications. The August 14, 2018 email from the embassy is the last communication Plaintiff and her attorney have received from the embassy about her visa and waiver applications.

140.   Saba'a's application for waiver pursuant to Section 3(c) of the Proclamation and her application for diversity immigrant visa remain pending.

141.   Defendants have not made a decision on whether they will issue waivers pursuant to Section 3(c) of the Proclamation to Saba'a so that she may receive a diversity immigrant visa and enter the United States.

142.   Defendants have not made a final determination on whether they will issue diversity immigrant visas to Plaintiff.

143. Plaintiff Saba'a is entitled to a decision by Defendants on whether she will be issued a waiver pursuant to Section 3(c) of the Proclamation and whether she will receive a diversity immigrant visa to enter the United States.

144. Defendants have a non-discretionary duty to adjudicate the waiver and diversity immigrant visa application submitted by Plaintiff Saba'a, imposed by 22 C.F.R. §§ 42.81(a), 42.81(e), Section 3(c) of the Proclamation, guidance issued by the State Department, and Defendants' numerous statements in court submissions that Plaintiffs are entitled to a decision on their waiver application.

145. Defendants have delayed unreasonably in deciding whether to issue waiver and diversity immigrant visa to Plaintiff Saba'a. Defendants' delay in making a decision on the waiver and diversity immigrant visa application is unreasonable given the September 30, 2018 deadline for issuance of the diversity immigrant visas.

146. Defendants' failure to issue waivers prevents the issuance of a diversity immigrant visa to Plaintiff Saba'a, thereby preventing Plaintiffs from escaping the abusive control of Saba'a's ex-husband and residing safely within the United States.

147. Defendants' failure to issue a waiver under the Proclamation prevents the issuance of a diversity immigrant visa to Plaintiff Saba'a.

148. Accordingly, Plaintiffs' petition for a writ of mandamus and preliminary injunction directing Defendants to make a final decision on Plaintiff Saba'a's waiver and diversity immigrant visa applications, for a declaration that Defendants have unreasonably delayed the adjudication of Plaintiff Saba'a's waiver and diversity immigrant visa applications in violation of the APA, and for a declaration that the entire waiver process under the Proclamation is a sham.

## CAUSES OF ACTION

### COUNT ONE
**Mandamus Act**
**28 U.S.C. § 1361; 28 U.S.C. § 1651**
**(As to all Defendants)**

149. Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

150. Defendants are severally and jointly charged with the mandatory responsibility to administer and implement the Immigration and Nationality Act ("INA").

151. Defendants are each severally and jointly have a clear and non-discretionary duty to adjudicate Plaintiff's application for visa and to adjudicate Plaintiff's requests for waiver under Section 3(c) of the Proclamation made by individuals subject to the Proclamation.

152. Defendants have willfully refused to perform their clear, non-discretionary duties, including lawful adjudication of the waiver application and diversity visa application.

153. Plaintiff has a clear right to have her waiver application and diversity visa application adjudicated pursuant to the Proclamation, INA and regulations.

154. 22 C.F.R. § 42.81(a) states, "When a visa application has been properly completed and executed . . . the consular officer must either issue or refuse a visa under INA 212(a) or INA 221(g) or other applicable law."

155. 22 C.F.R. § 42.81(e) states, "If a visa is refused, and the applicant within one year from the date of refusal adduces further evidence tending to overcome the ground of ineligibility on which the refusal was based, the case shall be reconsidered."

156. Section 3(c) the Proclamation establishes a process by which an individual that is not exempt from the Proclamation can receive a waiver from the Proclamation's restrictions on entry, subsequently receiving a visa to travel to the United States.

157. Defendants' subsequent guidance and statements in court further establish that Defendants possess a duty to adjudicate waiver requests. While the decision to grant a waiver is discretionary, Defendants' own statements make clear that the duty to make a decision on an application for a waiver is not.

158. Further, Defendants' delay in taking action on Plaintiff's waiver and diversity immigrant visa application is unreasonable because the application has been pending for many months and Plaintiff will lose the chance to receive an immigrant visa after September 30, 2018.

159. Plaintiff is eligible for and has fulfilled all requirements for the diversity immigrant visa. She has submitted all necessary information and evidence supporting her application for diversity immigrant visa.

160. Plaintiff has fulfilled all requirements for requesting a waiver pursuant to Section 3(c) of the Proclamation, has submitted sufficient evidence supporting her waiver request, and meets the eligibility criteria for issuance of a waiver under Section 3(c).

161. Plaintiff has a clear right to have her waiver application and diversity visa application adjudicated pursuant to the INA, its regulations, and consistent with the due process clause of the Fifth Amendment of the U.S. Constitution. This duty is owed under the INA, APA, and regulations, as well as, by charging a filing fee - which was properly paid. By accepting payment, Defendants created an obligation to process and adjudicate Plaintiffs' waivers and render a lawful decision.

162. Plaintiff has exhausted any administrative remedies that may exist and there exists no other adequate remedy.

163. Plaintiff's injuries will be redressed by compelling Defendants to adjudicate the waiver application and diversity visa application.

164.   Defendants each severally and jointly have the authority and jurisdiction required to adjudicate Plaintiff's waiver application and diversity visa application.

165.   The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the Plaintiff.  See 28 U.S.C. § 1361.

166.   Pursuant to 28 U.S.C. § 1361, Defendants must be compelled to discharge their statutory duties owed to Plaintiffs by rendering a proper and complete decision concerning Plaintiff's waiver application and diversity visa application that is in accordance with the evidence in the record such that the decision will be fair and accurate.

167.   Defendants have a clear, non-discretionary, and mandatory duty to adjudicate Plaintiff's visa and waiver application. There is no legal bar to doing so. Accordingly, Plaintiff has a clear and indisputable right to have her visa and waiver applications adjudicated.

<u>**COUNT TWO**</u>
**Administrative Procedures Act**
**(5 U.S.C. § 555; 5 U.S.C. § 701 et seq.)**
**(As to all Defendants)**

168.   Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

169.   Defendants' practices, interpretations of law, conduct and failure to act violate the Administrative Procedures Act ("APA"), as the alleged agency action is:

    a.   has caused "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review therefore." 5 U.S.C. § 702;

b.  has not afforded "all interested parties an opportunity for: (1) the submission and consideration of facts, arguments,…" under U.S.C. 554 § (c)(1);

c.  "unlawfully withheld or unreasonably delayed," proper decision under 5 U.S.C. § 706(1);

d.  not concluded "[w]ith due regard for the convenience and necessity of the parties . . . and within a reasonable time," under 5 U.S.C. § 555(b);

e.  is "arbitrary, capricious and an abuse of discretion or otherwise not in accordance with  law," under 5 U.S.C. § 702(2)(A); and

f.  was "without observance of procedures required by law," under 5 U.S.C. § 706(2)(D).

170.  Plaintiffs are entitled to injunctive relief pursuant 5 U.S.C. § 706(1) to "compel agency action unlawfully withheld" and to hold unlawful and/or set aside agency action that, as here, is not in accordance with the law. 5 U.S.C. § 706 et seq. See also Villa v. DHS, 607 F. Supp. 2d 359, 365 (N.D.N.Y 2009) (noting that APA § 555(b) requires USCIS to adjudicate applications within a reasonable time).

171.  Defendants' failure to render a proper and complete adjudication of Plaintiffs' Form I-130 Petition is a violation of the APA.

172.  Plaintiff is eligible for and has fulfilled all requirements for the diversity immigrant visa. They have submitted all necessary information and evidence supporting her application for diversity immigrant visas.

173.  Defendants have a clear and non-discretionary duty both to adjudicate applications for visas and to adjudicate requests for waivers under Section 3(c) of the Proclamation made by individuals subject to the Proclamation.

174. Defendants' subsequent guidance and statements in court further establish that Defendants possess a duty to adjudicate waiver requests. While the decision to grant a waiver is discretionary, Defendants' statements make clear that the duty to make a decision on an application for a waiver is not.

175. Defendants are severally and jointly required by the INA and the Fifth Amendment to the U.S. Constitution to properly adjudicate Plaintiff's waiver and application for immigrant visa.

176. As indicated above, the APA, 5 U.S.C. § 706(2), allows courts to hold unlawful and set aside agency actions, findings and conclusions found to be in excess of statutory authority, short of statutory right, and/or taken "without observance for procedures required by law." § 706(2)(D).

177. As a result of Defendants' arbitrary and capricious actions, Plaintiff has suffered and continue to suffer economic and non-economic damages consisting of mental pain and suffering and emotional stress due to the inability to have Plaintiff's waivers.

178. The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to Plaintiff. _See 28 U.S.C. § 1361_.

179. Under 28 U.S.C. § 1361, Defendants must be compelled to discharge their statutory duties owed to Plaintiff so that her waiver and diversity immigrant visa applications are properly adjudicated.

**COUNT THREE**
**Interference with and Deprivation of**
**First and Fifth Amendment Right to Familial Association**
**(Against All Defendants)**

180. The allegations set forth in Paragraphs above are repeated and incorporated as if fully set forth herein.

181. The Children contend that Defendants' policies, procedures, and methods for delaying the printing and issuing of the diversity visa and waiver applications for the Children's mother systematically violates the Children's right to familial association under the First and Fifth Amendments.

182. The Children have a constitutionally protected right to familial association with their family members, including companionship with their mother, in a manner that is free from unjustifiable government interference or deprivation.

183. First Amendment freedom of association protections are afforded to raising one's children and cohabitating with relatives. *Roberts v. United States Jaycees*, 468 U.S. 609, 620 (1984).

184. In *Strandberg v. City of Helena*, 791 F.2d 744 (9th Cir. 1986), the Ninth Circuit found that parents have the right of companionship from their children, including adult children based on the Fourteenth Amendment.

185. The Ninth Circuit then held on the same grounds that it was required as a matter of logic to *recognize a child's reciprocal right to companionship with parents*. *Smith v. City of Fontana*, 818 F.2d 1411, 1418-20 (9th Cir. 1983). (*Emphasis added*). ("We now hold that this constitutional interest in familial companionship and society logically extends to protect children from unwarranted state interference with their relationships with their parents. The companionship and nurturing interest of parent and child in maintaining a tight familial bond are reciprocal, and we see no reason to accord less constitutional value to the child-parent relationship than we accord to the parent-child relationship.")

186.    It is a matter of settled law that the Fourteenth Amendment provides enforcement of Fifth Amendment rights against states; therefore, when a right is recognized by a state court as being enforceable through the Fourteenth Amendment, the same right is enforceable against the federal government through the Fifth Amendment.

187.    Without the adjudication of the U.S. citizen Children's mother's diversity visa and waiver application, prior to the September 30, 2018 deadline, the U.S. citizen Children will be deprived of living safely with their mother. Upon return to Yemen, they will be taken away by their abusive father. The United States citizen children have a protected right to reside safely in the United States with their mother.

188.    To wit, Defendants' unlawful delay of adjudicating their mother's diversity visa and waiver applications constitutes a de facto deprivation of the Children's constitutionally protected right to familial association under the First and Fifth Amendments of the United States Constitution.

189.    As a result, Plaintiff Children have suffered and continue to suffer irreparable harm and damage entitling them to declaratory, injunctive and other relief.

**COUNT FOUR**
**The Unenumerated Rights Reserved for the People by the Ninth Amendment to the Constitution of the United States**
**(Against All Defendants)**

190.    The allegations set forth in Paragraphs above are repeated and incorporated as if fully set forth herein.

191.    Plaintiffs contend that Defendants' policies, procedures, and methods for delaying the printing and issuing of Saba'a's diversity visa and waiver applications systematically violates the Children's fundamental right to integrity of the family.

192.   The Ninth Amendment to the Constitution of the U.S. states "[t]he enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."

193.   Rights not specifically enumerated in the Constitution have been recognized by courts across the United States and are implied in and embody the very spirit of what it means to be an American, a citizen of the United States, and the values that we as a people and a Nation hold dear.

194.    The "purpose of Ninth Amendment is to guarantee to individuals those rights inherent to citizenship in democracy which are not specifically enumerated in Bill of Rights." *United States v Cook*, 311 F.Supp. 618, 620 (W.D. Pa. 1970). "Rights under Ninth Amendment are only those 'so basic and fundamental and so deeply rooted in our society' to be truly 'essential rights,' and which nevertheless, cannot find direct support elsewhere in Constitution." *United States v Choate*, 76 F2d 165, 181 (9th Cir. 1978) (citing *Griswold v. Connecticut*, 381 U.S. 479, 488-489, 491 (2001)).

195.   The fundamental unenumerated right to integrity of the family was recognized in *In re S.,* 581 P2d 884, 889 (1978) ("fundamental integrity of the family unit … is subject to intrusion and dismemberment only where "compelling" State interest arises").

196.   The unique power and import of Ninth Amendment fundamental rights and values, and the privilege of living in a country where these rights and values are woven into the cloth of our society, our law, and our justice system is what has drawn millions of immigrants to our shores and continues to draw immigrants to our shores today. A "textual exegesis, is by no means conclusive, it suggests that 'the people'… to whom rights and powers reserved in the Ninth and Tenth Amendments, refers to class of persons who are part of a national

community or who have otherwise developed sufficient connection with this country to be considered part of that community." *United States v Verdugo-Urquidez*, 494 U.S. 259, 265 (1990). Indeed, our Declaration of Independence makes it clear that a vision of this very thing is what prompted our Framers to leave their countries, settle in North America, found this great Nation, and write a Constitution that protects these rights and values for posterity.

197. The Children are American citizens. Saba'a is a national of Yemen whose claim for immediate relief derives from a family relationship to the Children, and as such, Saba'a is part of the American national community who properly have a sufficient connection to the U.S. to be considered part of that community. It is therefore indisputable that Saba'a and the Children possess the fundamental right to integrity of the family.

198. Defendants' policies, procedures, and methods for delaying the printing and issuing of Saba'a's diversity visa and waiver applications systematically violates the Children's fundamental right to integrity of the family by preventing or delaying the unification of Plaintiffs' family in the United States.

199. As a result, Plaintiffs have suffered and continue to suffer irreparable harm and damages entitling them to declaratory, injunctive and other relief.

### COUNT FIVE
**Declaratory Judgment Act**
**(28 U.S.C. § 2201)**
**(As to All Defendants)**

200. The allegations set forth in Paragraphs above are repeated and incorporated as if fully set forth herein.

201. Defendants' actions and decisions relating to the unlawful adjudication of Plaintiff's visa and waiver application procedures violate the INA and federal regulations.

202. Plaintiffs seek a declaration to that effect under 28 U.S.C. § 2201 as the Defendants have severally and jointly failed to discharge their mandated official duties.

203. As a result, Plaintiffs have suffered and continue to suffer irreparable harm and damage entitling them to declaratory, injunctive and other relief.

### COUNT SIX
**(Equal Access to Justice Act)**
**(5 U.S.C. § 504; 28 U.S.C. § 2412)**

204. The allegations set forth in Paragraphs above are repeated and incorporated as if fully set forth herein.

205. If Plaintiffs prevails, they will seek costs under the Equal Access to Justice Act ("EAJA"), as amended, 5 U.S.C. § 504 and 28 U.S.C. § 2412.

### PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request that the Court to grant the following relief:

1. Issue a writ of mandamus and preliminary injunction directing Defendants to adjudicate Plaintiff Saba'a's application for waiver pursuant to Section 3(c) of the Proclamation, and issue a final determination on Plaintiff Saba'a's applications for diversity immigrant visas no later than September 20, 2018;

2. Declare that Defendants' delay in adjudicating Plaintiff Saba'a's application for waiver pursuant to Section 3(c) of the Proclamation and Plaintiff Saba'a's application for diversity immigrant visa is unreasonable and violates the APA, and that Plaintiff Saba'a is entitled to a prompt adjudication of her waiver and visa applications no later than September 20, 2018;

3.   Declare that Defendants' delay in adjudicating Plaintiff Saba'a's application for waiver pursuant to Section 3(c) of the Proclamation and Plaintiff Saba'a's application for diversity immigrant visa violates the Children's fundamental right to familial association and to live safely with their mother in the United States;

4.   Declare that the delay in adjudicating Plaintiff Saba'a's application for waiver pursuant to Section 3(c) of the Proclamation and Plaintiff Saba'a's application for diversity immigrant visa is in part because the entire waiver process under the Proclamation is a sham;

5.   Find that the Government has misrepresented the waiver process under the Presidential Proclamation and therefore the entire Presidential Proclamation is null in void because there is no waiver;

6.   An award to Plaintiffs of reasonable costs and attorneys' fees; and

7.   Such other and further relief that this Court may deem fit and proper.

Dated: September 13, 2018

By:    s/ Julie A. Goldberg, Esq.
JULIE A. GOLDBERG, ESQ.
Goldberg & Associates
5586 Broadway,
Third Floor
Bronx, NY 10463
(718)432-1022;
(718)432-1044 (facsimile)
*Attorneys for Plaintiffs*